[No. 14904.    Department Two.    March 13, 1919.]

UNION FARM LAND COMPANY, *Appellant,* v.
E. S. ISAACS, *Respondent.*[1]

CHATTEL MORTGAGES (3)—PROPERTY SUBJECT—CROPS—TITLE UNDER
EXECUTORY CONTRACT OF SALE. A chattel mortgage for an ante-
cedent debt upon a crop of wheat, executed by purchasers in pos-
session under an executory contract of sale, the mortgagee having
at the time knowledge of the vendor's right to take and retain all
growing crops on the land by reason of defaults, is subject to the
rights of the vendors, there being, as to them, no constructive sev-
erance of the crop by the giving of the mortgage.

CROPS (3)—CONTRACTS—EXECUTORY CONTRACT OF SALE—FORFEITURE
OF MORTGAGOR'S TITLE. The title to growing crops, as between vendor
and purchaser, is determinable by the terms of the contract, and a
chattel mortgage thereon by the vendee cannot affect the rights of
the vendor upon a forfeiture of the contract of sale.

Appeal from a judgment of the superior court
for Walla Walla county, Mills, J., entered April 3,
1918, upon findings in favor of the defendant, in an
action to foreclose a chattel mortgage. Reversed.

*Merritt, Lantry & Merritt,* for appellant.

*Gillis & Miller,* for respondent.

PARKER, J.—This action was commenced by the
plaintiff land company in the superior court for Walla
Walla county, under Rem. Code, § 1110, causing to be
removed to that court proceedings instituted by the
defendant Isaacs, looking to the foreclosure of a chat-
tel mortgage by the summary process of notice and
sale under § 1104, Rem. Code; the mortgage purport-
ing to be a lien upon wheat taken into the possession
of the land company, which it claimed to own free
from such lien. After the commencement of this ac-
tion, the land company deposited with the clerk of the

[1]Reported in 179 Pac. 84.

superior court $750 in cash, which by stipulation of the parties was to be held in lieu of the wheat, and from which any judgment rendered in the action in favor of Isaacs was to be paid. Trial upon the merits resulted in findings and a judgment in favor of Isaacs and against the land company for the sum of $657. From this disposition of the case, the land company has appealed to this court.

On October 25, 1915, W. I. Long and wife and E. W. Eaves and wife, were owners of the land on which the wheat here in question was thereafter grown. On that day, they, as parties of the first part, entered into a contract in writing with C. S. Sherman and wife, as parties of the second part, for the sale of the land. A payment was then made by Sherman and wife upon the purchase price, and it was agreed that they were to pay the balance thereof in annual installments, extending over a number of years. Such payments, except as otherwise specially provided for in the contract, were to be made by Sherman and wife from the proceeds of the crops to be grown by them upon the land. Among the payments to be made, one was specified in the contract as follows:

"That in addition to the crop payment above provided the parties of the second part agree to pay to the parties of the first part, on or before December 31, 1916, the sum of Twenty-five Hundred ($2,500.00) Dollars in cash."

The contract further provided as follows:

"It is further understood and agreed by and between the parties hereto that time is the essence of this contract and an essential part thereof, and it is further understood and agreed that no right, title or interest in and to said premises shall vest in said parties of the second part by virtue of this agreement until all of the payments above specified shall have been made, and the covenants herein performed. That

if the said parties of the second part shall fail to pay the whole or any part of the sums above mentioned or interest thereon within the time and on or before the date above specified herein and within which the same is within the terms of this contract due and payable, or fail to do or observe any of the acts ·or things by them according to the terms of this agreement to be done or observed, then in that event all the rights of the parties of the second part under and by virtue of the terms of this contract shall cease and determine and all improvements on said premises made by the parties of the second part and all crops and produce then growing on said premises shall immediately be and become the property of the parties of the first part and the parties of the first part shall be released from all obligations under this contract and shall be forthwith entitled to the possession of said premises and every part thereof and to the said improvements and said crops and shall be entitled forthwith without notice to re-enter the said premises and any and every part thereof and take possession thereof and of said improvements and crops and expel all persons from said premises and from every part thereof and neither the parties of the second part nor any other person shall by virtue of this contract, or otherwise, acquire any interest in said improvements, crops or premises in conflict with the provisions of this contract, and no notice whatever of the determination of the parties of the first part to claim the benefit of the terms of this contract shall in any event be required to be given either to the parties of the second part or their heirs, assigns, tenants or subtenants or to any person holding or claiming under the parties of the second part in any manner.''

In June, 1916, Long and wife and Eaves and wife conveyed the land to appellant land company, and at the same time duly assigned to the land company all their right, title and interest under the contract for the sale of the land, Sherman and wife being parties to the assignment and consenting that the land com-

pany be substituted in the place of Long and wife and Eaves and wife under the sale contract. On August 26, 1916, Sherman being indebted to Isaacs in the sum of $1,000, executed and delivered to Isaacs his promissory note for that sum, payable November 26, 1916. A large portion of the debt evidenced by this note was unpaid on December 20, 1916, which, it will be noticed, was some time after its maturity; and on that day Sherman executed and delivered to Isaacs the chattel mortgage here in question, purporting to create a lien upon the crop to secure the payment of that debt, which crop had been, a short time previously in the fall of 1916, planted upon a portion of the land, with a view that it be harvested at the end of the crop season of 1917. While the note and mortgage were signed by Sherman alone, we assume that he executed both of them in behalf of the community composed of himself and wife.

The chattel mortgage was duly filed for record in the office of the auditor of Walla Walla county on December 22, 1916. The land sale contract, which had in effect become one between the land company and Sherman and wife, was not recorded in the office of the auditor of Walla Walla county so as to constitute constructive notice of its existence and contents. But the evidence plainly shows, principally in Isaacs' own testimony, that he knew, at the time of the execution and delivery to him of the chattel mortgage, that Sherman and wife were in possession of the land on which the mortgaged crop had been planted under an executory contract for the sale of the land by the land company; that the land company was then the owner of the land; and that, while Isaacs did not know of the conditions embodied in the sale contract above quoted, Isaacs could have easily informed himself of these conditions of the sale contract by proper inquiry.

The $2,500 cash payment which became due from Sherman and wife upon the sale contract on December 31, 1916, was not paid by them, they at that time asserting, in substance, that they were unable to pay the same or continue their performance of the contract; and thereupon the land company had the right to elect, and did elect, to claim that Sherman and wife had forfeited all their rights under the contract. In order to avoid the costs of legal proceedings to re- cover possession of the land and the crops which had been planted thereon, the land company gave to Sher- man and wife the sum of $90; and on January 5, 1917, they executed and delivered to the land company a quitclaim deed for the land, and surrendered posses- sion thereof to it. Thereafter the land company cared for all of the crops grown thereon during the season of 1917, including the wheat crop planted thereon by Sherman and wife in the fall of 1916, which had been mortgaged to Isaacs; and at the close of the crop sea- son of 1917, the land company harvested and appro- priated all of the crops as its own.

These facts, all of which are either conceded or con- clusively proven, we think render it plain not only that the mortgage was given by Sherman and wife to Isaacs to secure an antecedent and past due debt, but that Isaacs took the mortgage, in legal effect, with full knowledge of all the forfeiture provisions of the sale contract between Sherman and wife and the land company, including its right to take and retain as its own all growing crops upon the land, upon the failure of Sherman and wife to perform the condi- tions of the contract by them to be performed. Coun- sel for Isaacs do not seem to seriously argue to the contrary. Indeed, we think there is no sound basis for any such argument.

The argument here made in behalf of Isaacs, as we understand counsel, proceeds upon the theory that, by the giving of the mortgage to him by Sherman and wife, there was a constructive severance of the mortgaged crop from the land, citing a number of authorities touching the question of constructive severance of growing crops from the land by contract. We may concede, for argument's sake, that there was, by the giving of the mortgage, a constructive severance of the mortgaged crop from the land, as between Sherman and wife and Isaacs. But we are quite convinced that it does not follow that there was any constructive severance of the crop from the land as between Sherman and wife and Isaacs and the land company. The latter's rights, in that respect, were governed by the express provisions in the sale contract under which Sherman and wife held the land; one of which was, that upon any failure of Sherman and wife to perform any of the conditions of the sale contract by them to be performed, all their rights thereunder should cease and terminate, and that

"All improvements on said premises made by the party of the second part (Sherman and wife) and *all crops and produce then growing on said premises,* shall immediately be and become the property of the party of the first part (land company) and the party of the first part shall be released from all obligation under this contract and shall be forthwith entitled to the possession of said premises and every part thereof and to the said improvements and *said crops.*"

In view of the fact that Isaacs had actual knowledge of the existence of the sale contract under which Sherman and wife held the land, and that he was thereby put upon inquiry as to the terms and conditions of the sale contract and the land company's forfeiture rights thereunder, we think, even apart from

the fact that the mortgage was taken to secure an antecedent and past due debt, it was not within the power of Isaacs and Sherman to effect a severance of the mortgaged crop from the land, as against the forfeiture rights of the land company which were expressly secured by the terms of its sale contract with Sherman and wife. We think that Isaacs acquired no higher right or claim to the mortgaged crop, as against the land company, than that possessed by Sherman and wife, under the express terms of the sale contract; and that the right of forfeiture of the growing crop, possessed by the land company under the sale contract, was enforceable by it against Isaacs as well as against Sherman and wife. This the land company effectually did when it took possession of the land and crops in January, 1917, because of the failure of Sherman and wife to perform the conditions of the sale contract by them to be performed.

In *Lynch v. Sprague Roller Mills,* 51 Wash. 535, 99 Pac. 578, Chief Justice Rudkin, speaking for the court, said:

"There may be no direct analogy between the relation of landlord and vendor, but, independent of statute, the rights of either in crops grown on the land which is the subject of the sale or lease are dependent on contract, and the construction which courts have uniformly placed on contracts between landlord and tenant is a safe rule to follow in construing similar contracts between vendor and purchaser. The general rule on this subject as between landlord and tenant is thus stated:

" 'The title to the crops raised by one man on another man's farm depends largely if not entirely upon the contract between the two men. If the contract amounts to a lease or demise of the land by the owner to the occupier, then clearly the crops belong to the occupier whether he pays rent in money, or in kind by a share of the crops. The occupier in such case

becomes the owner *pro hac vice,* and has title to the products of the farm until division.'   24 Cyc. 1469.''

This was said in discussing the question of title to wheat grown upon and harvested from land by those holding land under an executory contract for its purchase, with the owner thereof, it being agreed in the contract that a certain portion of the proceeds of the sale of the crops grown upon the land by the vendees, should be applied by them annually for a number of years towards the payment of the purchase price. That case did not involve any forfeiture provisions of the contract. The ultimate question was as to the defendant roller mills' title to the wheat as against the claim of the owner of the land made to the wheat after it was harvested and sold to the roller mills by the landowner's vendee.

In the case before us, counsel for both sides seem to rely upon that decision. Counsel for Isaacs argue that it supports their contention, in that the title to the mortgaged crop was in Sherman and wife when the mortgage thereon was given by them to Isaacs, and that, therefore, the mortgaging of the crop effected a severance of it from the land as to all persons; while counsel for the land company argue that it supports their contention, in that it recognizes that the title to growing crops, as between vendor and vendee, is determinable by the terms of the contract under which the vendee has possession of the land; and that we here have express terms in the contract between the land company and Sherman and wife for the sale of the land, which renders the land company's forfeiture rights not only effectual as against Sherman and wife but also as against Isaacs. It seems to us that that decision lends support to the contention made in behalf of the land company, much more

than to that made in behalf of Isaacs, in view of the express forfeiture terms of the contract existing between the land company and Sherman and wife, the notice thereof with which Isaacs was charged, and the fact that there was no actual severance of the crop from the land when the crop with possession of the land was forfeited to the land company and the rights of Sherman and wife and Isaacs terminated. We see no escape from the conclusion that, when the forfeiture of the rights of Sherman and wife, under the terms of that contract, was effected, the rights of Isaacs under his chattel mortgage were also terminated, and that the land company thereby became the absolute owner of the crop. Our decision in *Woody v. Wagner,* 89 Wash. 429, 154 Pac. 819, supports this conclusion.

The judgment is reversed.

FULLERTON, MAIN, and MOUNT, JJ., concur.

HOLCOMB, J. (concurring)—I concur in the above result, but not entirely in the reasoning. The sole and sufficient basis for the result is that appellant, holding the legal title, and vendor in the executory contract of sale, became lawfully re-possessed of the premises on which the mortgaged wheat was grown while the wheat was immature and physically unseverable from the soil, and although the crop was *fructus industriales* and subject to severance when mature and the property of the grower and his mortgagee then, if the occupant of the soil could not retain possession until the crop was mature and severable, no more could his mortgagee, who stood in no better position than he. While the chattel mortgage was a valid incumbrance given for a bona fide consideration, whether antecedent or contemporaneous, and upon a species of property capable of being mortgaged, the

mortgagee took subject to the risk of a valid dispossession prior to the time when the crops should become entirely personal and severable.